# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL ALLEN SINKO,            :
                                :
                    Plaintiff   :     No. 3:15-CV-1781
                                :
        vs.                     :     (Judge Nealon)
                                :
CAROLYN W. COLVIN, Acting       :
Commissioner of Social Security, :
                                :
                    Defendant   :

FILED
SCRANTON

APR 2 1 2017

PER
DEPUTY CLERK

## MEMORANDUM

On September 14, 2015, Plaintiff, Michael Allen Sinko, filed this instant
appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner
of the Social Security Administration ("SSA") denying his application for
disability insurance benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. § 1461, et seq. (Doc. 1). The parties have fully briefed the appeal. For the
reasons set forth below, the decision of the Commissioner denying Plaintiff's
application for DIB will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] his applications for DIB and SSI on July 22, 2012, alleging disability beginning on March 10, 2012,[3] due to a combination of degenerative disc disease, Bipolar Disorder, agoraphobia, Post Traumatic Stress Disorder ("PTSD"), Social Anxiety Disorder, and Alcoholism. (Tr. 13, 173).[4] The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on October 22, 2012. (Tr. 13). On November 23, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 13). A hearing was held on December 16, 2013, before administrative law judge Patrick Cutter, ("ALJ"), at which Plaintiff and an impartial vocational expert Gerald W. Keating,

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. Res judicata bars consideration of the time period before March 10, 2012, because Plaintiff has already filed previous disability applications for the time period of October 16, 2010 through March 9, 2012 that have already been decided. There was no basis for reopening these prior applications, and Social Security Regulation ("SSR") 91-5p does not apply to this effect either.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 21, 2015. (Doc. 9).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

("VE"), testified. (Tr. 13). On February 22, 2014, the ALJ issued an unfavorable decision denying Plaintiff's applications for DIB and SSI. (Tr. 13). On April 23, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 6). On July 13, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on September 14, 2015. (Doc. 1). On December 21, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed a brief in support of his complaint on February 4, 2016. (Doc. 10). Defendant filed a brief in opposition on April 11, 2016. (Doc. 13). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on June 28, 1971, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 169). Plaintiff did graduated from high school, and can communicate in English. (Tr. 172, 174). His employment records indicate that he previously worked as a baker, facilities

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

manager, and sous chef. (Tr. 175).

In a document entitled "Function Report - Adult" filed with the SSA on August 30, 2012, Plaintiff indicated that he lived in a house with friends. (Tr. 184). When asked how his injuries, illnesses, or conditions limited his ability to work, Plaintiff stated, "back injury prevents me from being able to work by limiting amount of time standing, sitting, bending, lifting and sometimes walking." (Tr. 184). From the time he woke up until he went to bed, Plaintiff prepared meals, exercised, cleaned, watched television, and played video games. (Tr. 185). Plaintiff had no problems with personal care, prepared "complete meals" for five (5) hours daily, cleaned, did the laundry, and shopped in stores for clothes and food one (1) to two (2) times a month for one (1) to two (2) hours at a time. (Tr. 187). He went outside every day, but was not able to go out alone due to Social Anxiety Disorder. (Tr. 187). His hobbies included watching television, playing video games, and building scale-model airplanes. (Tr. 188). He spent time with others one (1) time a month by talking or going out to lunch, and did not have difficulty getting along with others. (Tr. 188-189). On a daily basis, he went to counseling appointments and "Workabilities Clubhouse." (Tr. 188). He could walk for a quarter of a mile before needing to rest for ten (10) minutes. (Tr. 163). When asked to check what activities his illnesses, injuries, or conditions affected,

Plaintiff did <u>not</u> check talking, hearing, seeing, memory, understanding, following instructions, using hands, or getting along with others. (Tr. 189).

Regarding his concentration and memory, Plaintiff did not need special reminders to take care of his personal needs, take his medicine, or go places. (Tr. 186, 188). He could count change, handle a savings account, pay bills, and use a checkbook. (Tr. 187). He could pay attention for up to two (2) hours, was able to finish what he started, followed written instructions well, handled stress "not well," and handled changes in routine "good." (Tr. 189-190).

At the oral hearing on December 16, 2013, Plaintiff initially testified that, regarding his mental health impairments, he visited a psychologist every three (3) months, did not see a counselor or therapist, was not involved in group therapy, and was not a member of any addiction network. (Tr. 59). He testified that the reason he did not receive more treatment was because he could not obtain insurance. (Tr. 72). His medications, which included Lithium, Ability, Cogentin, and Klonopin, were "very effective" with the only stated side effect of tiredness from Klonopin and excitability from Abilify. (Tr. 63-64). His mental health symptoms were aggravated by being in public and around people because it made him paranoid. (Tr. 64). He testified that, during the relevant time period, he was hospitalized once at the end of 2013. (Tr. 67). He experienced auditory

hallucinations, such as hearing children playing outside and hearing music in his head that did not go away. (Tr. 67). He stated he had some difficulties getting along with others due to anxiety and paranoia, and had problems with memory and concentration. (Tr. 62, 69).

In terms of activities of daily living, Plaintiff testified that he was able to take care of his personal needs, cook, clean, do the laundry, use the computer, play the guitar and video games, build scale models, hike, read, shop, and watch television. (Tr. 60-61). He was able to pick up an object weighing thirty (30) pounds, could raise his legs and put them down in a seated position, was able to raise his arms forward and bring them backward and reach overhead, was able to stand for about two (2) hours before needing to sit, was able to sit for about an hour, and was able to walk a couple of miles. (Tr. 62-63).

## MEDICAL RECORDS

### A. Medical Evidence

#### 1. Sunbury Community Hospital

On May 28, 2012, Plaintiff presented to Sunbury Community Hospital ("Sunbury") due to lower back pain after slipping on the stairs in his home and striking his back. (Tr. 341). His physical examination revealed negative straight leg raise tests bilaterally, absent paralumbar tenderness and spasm, a non-focal

sensorimotor exam, unremarkable deep tendon reflexes, and a normal dorsiflexion at the great toe bilaterally. (Tr. 341). The impression was that Plaintiff had a contusion of his middle and lower back, and Plaintiff was discharged home on the same day as presentation in a stable condition. (Tr. 341).

On August 15, 2012, Plaintiff presented to the ER at Sunbury for lower back pain. (Tr. 449). A physical examination revealed a positive straight leg test on the right side; bilateral paraspinal tenderness and spasm; moderate tenderness to palpation of the lower lumbar spine; normal range of motion in his extremities; and symmetric deep tendon reflexes. (Tr. 450). Plaintiff was treated with Toradol and was discharged home with a diagnosis of acute sciatica. (Tr. 450).

On September 14, 2012, Plaintiff presented to the ER at Sunbury for psychiatric symptoms. (Tr. 453). He reported having hallucinations. (Tr. 453). His examination revealed a non-tender spine and alertness and orientation to person, place, and time with a normal affect. (Tr. 454). Plaintiff was discharged home with a clinical impression of both mania and insomnia and was stable on discharge. (Tr. 455).

On December 14, 2012, Plaintiff presented to the ER at Sunbury for "fleeting thoughts," bizarre behavior, and an overdose of Klonopin. (Tr. 395). His physical examination revealed he was oriented to person, place, and time; had clear lungs with equal breath sounds bilaterally; had a non-tender spine; and had a

mildly constricted affect, organized thoughts, appropriate thought content. (Tr. 396, 405). Plaintiff reported he had been experiencing racing thoughts, difficulty sleeping, depression, a lack of motivation, anhedonia, negative thinking, lability, and stress. (Tr. 399). It was noted that Plaintiff denied having suicidal thoughts and overdosing on Klonopin, that he "never meant to hurt himself," that he felt safe and had improved coping skills with treatment from therapy, and that he had improvement in his mood and feelings of safety. (Tr. 399). Plaintiff was admitted to the Psychiatry Unit voluntarily. (Tr. 396, 399). His Seroquel and Lithium doses were increased, and Plaintiff was compliant with his medication. (Tr. 399). His Axis I diagnoses were Bipolar Disorder status post overdose, Obsessive Compulsive Disorder, Post-traumatic Stress Disorder, and Alcohol Dependence based on history. (Tr. 399). On December 20, 2012, Plaintiff was discharged in a stable condition with an improved mood; was instructed that he could perform unrestricted activities of daily living; was told that he should avoid alcohol and street drugs; and was instructed to continue on his medications, including Seroquel and Lithium Carbonate, as directed. (Tr. 397).

From September 22 to September 26, 2013, Plaintiff was admitted to Sunbury due to suicidal ideations. (Tr. 644). It was noted that Plaintiff had Bipolar Disorder with depression and alcohol dependence in sustained remission for four and a half (4 ½) years. (Tr. 644). Plaintiff reported that his roommate

8

kicked him out due to his psychiatric problems, and that he wandered through people's backyards in his underwear, but when he came to his senses, he became "hopeless, helpless, and [had] suicidal ideations" that brought him to the ER. (Tr. 644). He reported that his mood at that time was melancholic, that some days he felt good and some depressed and sad, that he slept four (4) hours per night, that his energy was low, and that he had been having panic attacks up to two (2) times a day. (Tr. 644). Plaintiff's examination revealed clear lungs bilaterally; good eye contact; articulate speech; a sad and depressed mood; a restricted affect; positive suicidal ideations with no plans; linear and goal-directed thought processes; intact recent and remote recall; fair insight; intact judgment; and an adequate fund of knowledge. (Tr. 646). His Axis I diagnoses included Bipolar Disorder, depression, status post questionable psychotic episode, OCD by history, PTSD by history, and alcohol dependence in full sustained remission. (Tr. 646). Plaintiff was prescribed Celexa to improve his mood and anxiety, and Topamax to stabilize his mood and help with sleep. (Tr. 647). He remained in the hospital until September 26, 2013, when he was discharged with improvements in his thoughts, social functioning, and self-care. (Tr. 648). His discharge diagnoses included Bipolar disorder, depressed; Generalized Anxiety Disorder, improved; and Personality Disorder, not otherwise specified, improved. (Tr. 648).

## 2. **Dr. Pagnana-DeFazio**

On August 20, 2012, Plaintiff had an appointment with Dr. Pagnana-DeFazio due to complaints of a cough, congestion, and back pain. (Tr. 368). It was noted during the physical examination that Plaintiff had a normal gait; grossly intact sensation to light touch; brisk and symmetric patellar reflexes bilaterally; a normal mood and affect; grossly intact cranial nerves; negative straight leg raise tests; 5/5 muscle strength bilaterally; and bilateral muscle spasms and firmness in the lumbar spine. (Tr. 369). Plaintiff was diagnosed with lumbago, an upper respiratory infection, and otitis media. (Tr. 369). Plaintiff was prescribed a Medrol dose pack and Ultram. (Tr. 369).

On September 17, 2012, Plaintiff had an appointment after an ER visit for mania. (Tr. 370). He reported that he was doing better, and that he did not have chest pain or shortness of breath, but did struggle with "discogenic disc disease" and mechanical back pain with radiculopathy bilaterally. (Tr. 370). His medications at this visit included Ultram, Lithium Carbonate, Seroquel, Benztropine Mesylate, and Klonopin. (Tr. 370). His physical examination revealed a normal gait; negative straight leg raise tests bilaterally; normal toe walk and heel walk; paraspinal muscle spasm and tenderness in the lumbar spine; sensation grossly intact to light touch; grossly intact cranial nerves; a normal mood and flat affect; and difficulty keeping a train of thought "online and on

point." (Tr. 371). He was assessed as having Neuritis or Radiculitis of the thoracic or lumbosacral region, Bipolar Disorder, Post-Traumatic Stress Disorder, and Obsessive Compulsive Disorder. (Tr. 371).

### 3. **Northumberland Counseling Services**

On June 25, 2012, Plaintiff had an appointment at Northumberland Counseling Services ("NCS"). (Tr. 347). He reported that he had not been feeling well, that he had less interest and motivation, his focus was decreased, and that he had experienced a paranoid episode during which he could not leave the house because he thought people were taking pictures of him. (Tr. 347). It was noted that Plaintiff worked with his dad and cousins and "got paid for it." (Tr. 347). Plaintiff's mental status examination noted Plaintiff had the following: psychomotor retardation; normal speech; a dysthymic mood; a goal-directed thought process; an alert sensorium; impaired cognition; fair judgment; and no hallucinations. (Tr. 347). Plaintiff's Axis I diagnosis was Bipolar Disorder with psychosis and substance abuse. (Tr. 347).

On July 16, 2012, Plaintiff called NCS due to depression, not sleeping well, and a start into a "rapid cycle." (Tr. 346). As a result, Plaintiff's Lithium dose was increased. (Tr. 346).

On August 30, 2012, Plaintiff had an appointment at NCS. (Tr. 433). Plaintiff reported that the had been sober for three (3) years, had decreased focus

and concentration, heard unusual music at night in his head, and could not talk on the phone in public. (Tr. 433). His mental status examination revealed appearance and behavior within normal limits; normal speech; a dysthymic mood and congruent affect; a goal-directed thought process; an alert sensorium; and fair judgment and impaired cognition. (Tr. 433).

On September 20, 2012, Plaintiff called NCS for Seroquel samples. (Tr. 426). He reported that he was doing "extremely well mood-wise on the combination of Seroquel and Abilify." (Tr. 426).

On December 3, 2012, Plaintiff had an appointment at NCS. (Tr. 424). He reported that, for a week in November, he developed psychotic symptoms, including confusion, memory loss, seeing people who were not real sitting in front of him asking him questions, increased energy, increased OCD, and increased racing thoughts. (Tr. 424). His mental status examination revealed appearance and behavior within normal limits; normal speech; a dysthymic mood and congruent affect; a goal-directed thought process; an alert sensorium; and fair judgment and impaired cognition. (Tr. 424).

On January 30, 2013, Plaintiff had an appointment at NCS. (Tr. 423). Plaintiff noted that he received an "A" on an online course. (Tr. 423). His mental status examination revealed appearance and behavior within normal limits; normal speech; an alert sensorium; fair judgment; and impaired cognition. (Tr. 423).

On April 18, 2013, Plaintiff had an appointment at NCS. (Tr. 420). His mental status examination revealed appearance and behavior within normal limits; normal speech; a euthymic mood and congruent affect; a concrete thought process; and grossly intact cognition. (Tr. 420).

On May 13, 2013, Plaintiff had an appointment at NCS. (Tr. 419). His examination was listed as "similar to 4/18/13." (Tr. 419). His Axis I Diagnosis was Bipolar Disorder. (Tr. 419).

On June 10, 2013, Plaintiff had an appointment at NCS. (Tr. 417). His mental status examination revealed appearance and behavior within normal limits; normal speech; a euthymic mood and congruent affect; a concrete thought process; and grossly intact cognition. (Tr. 417).

### 4. Behavioral Health and Intellectual Development Services

On July 29, 2013, Plaintiff had an appointment at Behavior Health and Intellectual Development Services ("BHIDS"). (Tr. 477). It was noted that his mental status evaluation was stable, and that Plaintiff was instructed to keep taking his medications, which included Lithium, Seroquel, Abilify, Klonopin, and Cogentin. (Tr. 477).

On September 16, 2013, Plaintiff had an appointment at BHIDS. (Tr. 478). His mental status evaluation remained unchanged, and he was instructed to continue taking his medications. (Tr. 478).

On November 21, 2013, Plaintiff had an appointment at BHIDS. (Tr. 480).

His mental status examination revealed he was alert and cooperative; had

moderate levels of anxiety; had a depressed affect; and had no plans of suicide or

homicide. (Tr. 480). Plaintiff reported that he had "no complaints," was

meditating and exercising, and that he was thinking of going back to school. (Tr.

480). Plaintiff was instructed to keep taking Abilify, Klonopin, Cogentin, and

Lithium Carbonate. (Tr. 480).

## B.     Medical Opinions

### 1.     Dr. Pagnana-DeFazio

On September 17, 2012, Jessica Pagnana-DeFazio, D.O. completed a

Medical Source Statement of Plaintiff's Ability to Perform Work-Related Physical

Activities. (Tr. 366-367). She deferred rendering an opinion to Plaintiff's

orthopedic physician that occurred on September 19, 2012. (Tr. 366-367).

### 2.     Dr. Sen

On October 8, 2012, Plaintiff underwent a consultative examination with

Sanjay Ken, M.D. (Tr. 373-376). Plaintiff reported that he experienced pain in his

cervical and lumbar spine, spasms in the back of his neck mainly while sleeping or

reading, localized lumbar pain without radiation, and numbness in his left leg after

standing for twenty (20) minutes. (Tr. 373). His physical examination revealed

normal range of motion in his shoulders, wrists, knees, hands, ankles, and hips

with one hundred percent (100%) grip strength bilaterally; normal chest wall movement bilaterally clear to auscultation; normal gait and station; 5/5 muscle strength in all extremities; coarse tremors in both hands; and a flat affect. (Tr. 375). Dr. Sen diagnosed Plaintiff with Major Depression with a diagnosis of Bipolar Disorder Type I and cervical and lumbosacral spine pain with the need to rule out Degenerative Disc Disease. (Tr. 376). Dr. Sen opined that Plaintiff could: lift and/ or carry up to twenty (20) pounds; stand, walk, and sit for up to two (2) hours; push and pull with his hands; "do 35 to 40 pounds, legs 50 pounds;" and occasionally bend, kneel, stoop, crouch, balance, and climb steps. (Tr. 375).

### 3. **Dr. Galdieri**

On September 14, 2012, Anthony Galdieri, Ph.D., performed a Psychiatric Review Technique. (Tr. 91). He considered Listing 12.04, Affective Disorders, and opined that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no repeated episodes of decompensation each of extended duration. (Tr. 90). He also opined that evidence did not establish the presence of "C criteria" for this Listing. (Tr. 90).

On that same date, Dr. Galdieri also completed a Mental Residual Functional Capacity Assessment form. (Tr. 94-96). He opined that Plaintiff was

moderately limited in his ability to understand, remember, and carry out detailed instructions; was able to perform one (1) to two (2) step functions; was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; was moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them; was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; was able to make simple decisions and follow short, simple directions; was moderately limited in his ability to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to accept instructions and respond appropriately to criticism from supervisors; was moderately limited in his ability to respond appropriately to changes in the work setting; and would be able to adapt without special supervision. (Tr. 94-96).

### 4. **Dr. Bonita**

On October 24, 2012, Louis Bonita completed a Physical Residual Functional Capacity Assessment form. (Tr. 92-94). He opined Plaintiff could: occasionally lift and/ or carry up to twenty (20) pounds; frequently lift and/ or carry up to ten (10) pounds; stand, walk, and/ or sit for six (6) hours in an eight (8)

hour workday; and engage in unlimited pushing and/ or pulling within the aforementioned weight restrictions. (Tr. 92).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. (Tr. 16). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of March 10, 2012. (Tr. 16).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of the following impairments: "bipolar disorder; generalized anxiety disorder; depressive disorder; personality disorder; and alcohol dependence (20

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

C.F.R. 404.1520(c) and 416.920 (c)).” (Tr. 16-18).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of section 1.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 18-20).

At step four, the ALJ determined Plaintiff was capable of performing a full range of work at all exertional levels, stating the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: occasional climbing, balancing and stooping, never on ladders, avoid vibration and hazards, limited to simple routine tasks, low stress as defined as only occasional decision making and only occasional changes to the work setting, and no interaction with the public and only occasional interaction with co-workers.

(Tr. 20-25).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, he was unable to perform past relevant work, but that given his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could perform for both aforementioned RFC time periods. (Tr. 25-26).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time from March 10, 2012, through the date of the ALJ's decision. (Tr. 27).

## DISCUSSION

On appeal, Plaintiff alleges that: (1) the ALJ erred in concluding that Plaintiff's mental health impairments did not meet or medically equal Impairment Listing 12.04; (2) the ALJ erred by failing to consider the "type, dosage, effectiveness and side effects of medication, as well as treatments other than medication, as required by 20 CFR 416.929 and Social Security Ruling 96-7p;" (3) the ALJ failed to provide the VE with a hypothetical question that contained all of Plaintiff's medically established impairments. (Doc. 10, pp. 2-9). Defendant disputes these contentions. (Doc. 15, pp. 16-35).

### 1. Impairment Listing 12.04, Affective Disorders

Plaintiff asserts that the ALJ erred in concluding that Plaintiff's mental health impairments to meet or medically equal the severity requirements of Listing 12.04, Affective Disorders, and supports this assertion with medical records that are mainly not from the relevant time period. (Doc. 10, pp. 3-8). Plaintiff asserts that he met Impairment Listing 12.04 because he had marked restrictions in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and had repeated episodes of decompensation. (Id. at 7-8).

A claimant bears the burden of showing that her impairment meets or equals a listed impairment, and that he is thus presumptively disabled. Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 120 n.2 (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)). A plaintiff must meet all of the specified requirements of a Listing in order to be considered presumptively disabled. Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R. § 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1. Listings of Impairments for Mental Heath Disorders consists of paragraph A criteria that involves a set of medical findings, paragraph B criteria that involves a set of impairment-related functional limitations, and paragraph C criteria that involves a set of additional functional limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

The required level of severity for Listing 12.04 is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Paragraph "B" of these Listings requires two (2) of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B). Listing 12.04 paragraph "C" requires demonstration of a medically documented history of a chronic affective disorder of

at least two (2) years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medical or psychosocial support, and one (1) of the following: (1) repeated and extended episodes of decompensation; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one (1) or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(1)-(3).

To the extent that Plaintiff is arguing that he met criteria "B" of the mental disorder listings noted above, substantial evidence supports the ALJ's decision that Plaintiff: (1) had only mild restrictions in activities of daily living based on the testimony of Plaintiff, as he testified he was able to take care of his personal needs, do household chores, use the computer, play the guitar, build scale models, hike and walk, shop, read, write, do simple math, watch television, and read newspapers; (2) had moderate difficulties in social functioning based on Plaintiff's own testimony that he was paranoid when in public, was anxious, and found it difficult to go out alone, but that he had friends and went to the "Clubhouse;" (3)

moderate difficulties in concentration, persistence, or pace because, based on Plaintiff's testimony, while he had problems with focus, concentration, and memory, he completed high school, attended college, played the guitar, read, built scale models, and used the computer. (Tr. 18-19). The record also supports the ALJ's conclusion that, for the relevant time period, he did not experience repeated episodes of decompensation, each of extended duration. (Tr. 19). As such, based on Plaintiff's own testimony and the medical record, substantial evidence supports the ALJ's conclusion that Plaintiff's mental health impairments did not meet "criteria B" of Listing 12.04.

Substantial evidence also supports the ALJ's decision that Plaintiff did not meet criteria "C" for these Listings because, as noted by the ALJ:

> The undersigned has also considered whether the "paragraph C" criteria of sections 12.04 and 12.06 [] are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is no evidence of a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and repeated episodes of decompensation, each of extended duration or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Additionally there is no evidence that [Plaintiff] has a medically documented anxiety-related disorder

> attenuated by a complete inability to function independently
> outside the area of one's home.

(Tr. 19).

Furthermore, the ALJ states that "the opinion of a medical expert designated

by the Commissioner is required for the undersigned to find that an impairment, or

combination of impairments, equal a listing (SSR 96-5p and 96-6p). There is no

such opinion in the record." (Tr. 20). A review of the record finds this conclusion

to be true.

As such, substantial evidence supports the ALJ's Step Three finding that

Plaintiff's mental health impairments did not meet Listing 12.04 because the

evidence Plaintiff mentions to support his argument pre-date the relevant time

period and because the ALJ fully supported her determination with the medical

evidence and Plaintiff's own testimony as to what he was able to do. Therefore,

the ALJ's decision will not be disturbed on appeal based on this assertion.

### 2. Plaintiff's Mental Health Treatment

Plaintiff asserts that the ALJ erred in allegedly failing to consider the

medications Plaintiff took for his mental health impairments, and the other

treatment he sought for such impairments, into account. (Doc. 10, p. 8).

However, in turning to the ALJ's opinion, it is apparent that this assertion

maintains no merit. In the decision, the ALJ made reference to Plaintiff's

treatment, including the medications he was taking, the fact that Plaintiff testified that at the oral hearing that the medications were "very effective," and the side effects that he testified two medications caused. (Tr. 22-24). As such, the ALJ's decision will not be disturbed on appeal based on this unsupported assertion.

### 3. Vocational Expert Hypothetical Question and Response

Lastly, Plaintiff asserts that the ALJ "failed to provide the [VE] with a hypothetical question which contained all of the medically established findings of record, particularly the combination of [] Plaintiff's severe medical impairments." (Doc. 10, p. 8). More specifically, Plaintiff asserts that the ALJ erred in failing to include Plaintiff's alleged issue with the "pressure of quotas" in the hypothetical question. (Id. at 8-9).

The United States Court of Appeals for the Third Circuit has held in that a hypothetical question must include all of a claimant's functional limitations which are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 553-55 (3d Cir. 2004); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). A hypothetical that omits limitations is defective, and the answer thereto cannot constitute substantial evidence to support denial of a claim. Ramirez, 372 F.3d at 553-55. However, "[w]e do not require an

ALJ to submit to the vocational expert every impairment <u>alleged</u> by a claimant."

<u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original).

When an ALJ's hypothetical question to a vocational expert sets forth the

Plaintiff's limitations, as supported by the record, the vocational expert's response

may be accepted as substantial evidence in support of the ALJ's determination that

the Plaintiff is not disabled. <u>See</u> <u>Chrupcala</u>, 829 F.2d at 1276.

As review of the records shows that the ALJ took the aforementioned

impairments and the limitations they caused as opined in the medical record into

account when determining the RFC. The ALJ accounted for the limitations caused

by Plaintiff's mental health impairments as the he limited Plaintiff to work that

involved only routine, low stress tasks with no interaction with the public and only

occasional interaction with co-workers. The ALJ then presented a supported RFC

determination to the VE, and the VE provided a response. Merely because

Plaintiff mentioned that he had difficulty meeting quotas does not equate to the

need for the ALJ to include that alleged difficulty into the RFC as it is without

support from the medical record. Furthermore, Plaintiff has failed to support this

assertion with evidence from the medical record that would support this alleged

limitation. As such, because the ALJ presented a proper RFC determination to the

VE, substantial evidence supports the hypothetical questions posed to the VE, and

the ALJ's determination will not be disturbed on appeal based on this assertion.

## CONCLUSION

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied, the decision of the Commissioner will be affirmed, and judgment will be entered in favor of Defendant and against Plaintiff.

A separate Order will be issued.

**Date**: April 20, 2017

/s/ William J. Nealon
**United States District Judge**